James E. BASS, Jr., Appellant,

v.

J. Robert METZGER et al., Appellees.

No. 1245.

Court of Civil Appeals of Texas,
Corpus Christi.

June 15, 1978.

Rehearing Denied Aug. 29, 1978.

James P. Ryan, Bruce D. Viles, Wood, Burney, Nesbitt & Ryan, Corpus Christi, for appellant.

Robert J. Patterson, Keys, Russell, Seaman & Mansker, Scott T. Cook, Harris, Cook, Browning & Barker, Corpus Christi, for appellees.

## OPINION

BISSETT, Justice.

This is a malicious prosecution case. James E. Bass, Jr., sued Joe D. Wilson, J. Robert Metzger, United Sales, Inc., Truman Cole and Copi-Rite, Inc. for actual and exemplary damages arising from a charge of felony theft of a copy machine filed against Bass by Wilson. Suit was filed on August 16, 1971. Cole, by special appearance contested the jurisdiction of the trial court and was later dismissed as a party defendant. Trial was to a jury. After a verdict was reached, the trial court set aside some of the jury's findings, and rendered judgment that Bass take nothing against Copi-Rite, but that he recover $10,000.00, as actual damages, against Wilson, Metzger and United Sales, jointly and severally, and $8,500.00 in exemplary damages against Wilson individually. From that judgment, Bass, Metzger and United Sales have perfected appeals. Wilson did not appeal.

On August 11, 1971, the defendant Joe D. Wilson signed a sworn complaint which charged Bass with stealing a certain copy machine on or about July 23, 1971. The complaint was filed on August 12, 1971.

Bass was then arrested, fingerprinted, photographed, and jailed. He was released on bond on the same day that he was arrested. The complaint, pursuant to a motion filed by Mr. Phil Westergren, an Assistant District Attorney of Nueces County, Texas, was dismissed by the Honorable Manuel N. Cantu, Jr., Justice of the Peace, Precinct No. 1, Nueces County, Texas, on August 23, 1971. Bass then filed suit for recovery of damages which he allegedly sustained because of the acts of the above-named defendants.

The jury, in answer to the several issues which bear on the disposition of this case, several of which, as submitted, contained more than one subsection, found:

Special Issue No. 1 — Bass was innocent of the charge of theft;

Special Issue No. 2 — Wilson acted without probable cause in filing the complaint against Bass;

Special Issue No. 3 — A criminal prosecution for theft against Bass was caused to be commenced by or with the aid or cooperation of 1) Joe D. Wilson, 2) J. Robert Metzger, and 3) United Sales, Inc.;

Special Issue No. 4 — Wilson and United Sales, Inc., "in causing, or aiding, or cooperating in the filing of the criminal complaint", acted with malice; Metzger acted without malice;

Special Issue No. 6 — Wilson was an employee of 1) Metzger, and 2) United Sales, Inc.;

Special Issue No. 6A — Neither Metzger nor United Sales, Inc., were reckless in having Wilson in their employ on August 12, 1971;

Special Issue No. 7 — Wilson was acting within the scope of his employment by 1) Metzger and 2) United Sales, Inc., at the time the complaint was filed;

Special Issue No. 8 — Wilson, in filing the complaint, was the agent of: 1) Metzger and 2) United Sales, Inc.;

Special Issue No. 8A — Wilson "had authority, express or implied" from 1) Metzger and 2) United Sales, Inc. to file the complaint;

Special Issue No. 9 — Wilson "was employed in a managerial capacity" by 1) Metzger and 2) United Sales, Inc., at the time he filed the complaint;

Special Issue No. 10 — Neither Metzger nor United Sales, Inc., "ratified the filing of the charge of theft against Bass";

Special Issue No. 11 — Bass sustained actual damages in the amount of $10,000.00;

Special Issue No. 12 — Bass was entitled to recover exemplary damages: 1) $8,500.00 against Wilson; 2) $12,500.00 against Metzger; and 3) $10,-000.00 against United Sales, Inc.

Copi-Rite, Inc. was absolved of all liability by the jury.

Bass filed a motion that judgment be rendered on the verdict. The trial court, in response to motions filed by Metzger and United Sales to disregard certain jury findings, set aside the jury's answer to Special Issue No. 4 wherein it was found that United Sales, Inc. "acted with malice", and further set aside the jury's answer to Special Issue No. 12(2) and (3), wherein it was found that Bass should recover, as exemplary damages, $12,500.00 from Metzger, and $10,000.00 from United Sales.

Bass, in his attack on the judgment in point 1, complains that the trial court erred in not awarding him judgment against Wilson, Metzger and United Sales, jointly and severally, in the amount of $31,000.00 for exemplary damages. He contends, in the alternative, by points 2–5, that it was error to disregard and set aside the jury's answer to Special Issue No. 12(2) and (3), and in not rendering judgment for him against Metzger in the amount of $12,500.00 for exemplary damages, and against United Sales in the amount of $10,000.00 for exemplary damages, as found by the jury. In point 6, it is asserted that the trial court erred in disregarding and setting aside the jury's answer to Special Issue No. 4(3) wherein it was found that United Sales "acted with malice".

Metzger and United Sales complain of the judgment also. They, by way of cross points, say that the trial court erred in rendering judgment against them for the reasons that there was no evidence to support the jury's answers to Special Issues 2, 3, and 4, and that such findings are not supported by factually sufficient evidence. Metzger, in a cross point, also contends that there was no evidence to support the jury's answers to Special Issues 6, 7, 8, 8A and 9, and that such findings are not supported by factually sufficient evidence.

The copy machine with which Bass was charged with stealing was owned by United Sales. The machine was placed in the possession of Flato Bros., in Corpus Christi, Texas, by Bass in March, 1970, under a rental-sales agreement. It remained in the actual possession of Flato's until about July 20, 1971, when it was picked up by Bass and removed from Flato's place of business.

Metzger, at all times pertinent to this case, lived in Plainview, Texas. In late December, 1970, Bass was employed by United Sales as its general manager of United Sales' business, located on Water Street, Corpus Christi, Texas. At that

time, Gerald Lee, who previously had been a service manager for United Sales, was acting as manager to run its daily business affairs. Bass was to take over the general operations of the business.

At a March 7, 1971, meeting between Bass, Lee and Metzger, Bass and Lee expressed their dissatisfaction with certain matters pertaining to the business. There is evidence that Bass informed Metzger at the meeting that he and Lee intended to go into business for themselves. As a result, it was agreed that the inventory business then owned by United Sales be liquidated. Bass was to be in charge of the liquidation.

Lee terminated his relationship with United Sales, and he and Bass began to operate a partnership copy machine business known as the "Bass and Lee Company". The Bass and Lee inventory was kept separately at a location on North Mesquite Street, Corpus Christi, Texas.

After the March 7, 1971, meeting, Bass, who had previously placed the copy machine in question with Flato, went to Flato's office and discussed the matter of their buying the machine outright with Mr. Louis Schmidt, Flato's representative. Bass was advised that Flato desired to continue using the machine under the agreement, rather than purchase it.

On June 24, 1971, Donald B. Brown, who owned 50% of the stock in United Sales, mailed a letter to United Sales' customers and advised them to no longer make payments to Bass at the Corpus Christi office, but instead to mail payments directly to Metzger, who owned the remaining 50% of United Sales' capital stock, in Plainview. When Bass learned of the letter, he telephoned Metzger and asked about Brown's letters. Metzger told him that Brown had informed him that Bass and Lee were converting the customers of United Sales over to the "Bass and Lee Company". Trouble between Metzger and Bass developed.

Metzger became concerned about his business interests in Corpus Christi. He met Cole in Memphis, Tennessee, in June, 1971, and discussed his problems with him. Cole told Metzger that he had an employee,

Joe D. Wilson, (a defendant in this case) and suggested that Wilson might like to go to work for Metzger. Later, Cole outlined to Wilson the problems Metzger was having and inquired as to whether or not Wilson would be interested in going to work for Metzger. An agreement was reached shortly thereafter between Metzger and Wilson.

Metzger executed a general power of attorney in favor of Wilson on June 28, 1971. The power of attorney, among other provisions, conferred upon Wilson power to:

". . . act for me in my place and stead in all transactions concerning United Sales, Inc.; to act as my agent in the running and operation of said business; to assume control and active operations of the said United Sales, Inc. . . . ."

Wilson then became general manager of the United Sales' store in Corpus Christi. Bass contacted Richard Hall, the attorney for United Sales, and told him that he wanted a final agreement prepared which would spell out exactly how he was to dispose of United Sales' properties in Corpus Christi. He further told Hall that he had no intention of turning over any records or properties belonging to United Sales without first talking to Metzger.

On June 30, 1971, United Sales filed a suit, styled "United Sales, Inc. v. James E. Bass, Jr., et al.," hereinafter referred to as the "United Sales" suit, against Bass and Lee. It sought a recovery of all assets owned by United Sales. The business of United Sales was being operated from the location on Water Street, and most of the inventory which belonged to United Sales was located there. Some of the inventory items belonging to United Sales, however, had been placed in storage by Bass in May, 1971, with Didear Van and Storage Company, Inc. Following the filing of the "United Sales" suit, several hearings were held relating to the taking of the inventory of United Sales' property and who should be placed in control of the same.

On July 13, 1971, the trial judge in the "United Sales" suit issued an order denomi-

nated "Order for Protection of Parties", wherein it was ordered that all items of property claimed by United Sales, be delivered by Bass to United Sales and Metzger. Bass was enjoined from disposing of any such property pending completion of the identification, valuation, selection and delivery of the property referred to in the Order. At that time, the copy machine with which Bass was later charged with stealing was in the physical possession of Flato's.

On July 20, 1971, as aforesaid, Bass removed the copy machine in question from the Flato premises, and delivered a new machine, owned by Bass and Lee, to them. At the same time, Bass gave Flato a credit of $360.00 against the purchase price of the first machine, in accordance with the pre-existing rental-sale agreement.

On July 29, 1971, a second hearing was had before the trial judge in the "United Sales" suit with regard to the United Sales' inventory. Those present at the hearing included Bass, Wilson, Metzger and Hall. The judge ordered that the United Sales' property then in the custody of Bass and Lee be placed in the Didear Storage Warehouse, and further ordered that if any other such property came into the possession of Bass and Lee, it, too, was to be placed in the warehouse. On August 4, 1971, Bass placed the subject copy machine in the Didear warehouse.

Sometime after July 29, 1971, apparently on August 11, 1971, Wilson went to Flato's to check on the copy machine in question. Schmidt testified that he told Wilson that Bass had picked up the machine, and that Bass represented to him that he was going to put it in a bonded warehouse. Wilson denied that Schmidt made any such statement to him.

Wilson testified that he telephoned Metzger on August 11, 1971, and informed him "of the facts I had", which, in summary, were that Bass had, sometime previously, picked up United Sales' copy machine from Flato's and that he did not know what he (Bass) had done with it. He said that he did not recommend to Metzger that a complaint be filed against Bass, and there was no discussion concerning the filing of such a complaint. He further testified that Metzger told him:

"to take the same information I had given him and go talk to Mr. Hall, and whatever Mr. Hall said, get his advice."

He also stated that Metzger did not instruct him "to talk to the DA's office". Wilson then went to Hall's office. Wilson further testified:

"Mr. Hall instructed me to go to the DA's office".

Wilson did not testify as to what he told Hall, but that Hall told him that "there were no warehouse receipts" which showed that the missing copy machine "was in any warehouse", and advised him to tell the District Attorney all that he "knew about the matter".

The record further shows that Wilson, by deposition, testified:

"Q And you went to the office of the DA with the idea of filing a complaint against James Bass?

A Yes, sir, that's what I was advised to do.

Q By whom?

A By Richard Hall."

Wilson, following his visit to Hall's office on August 11, 1971, on the same day went to the District Attorney's office and talked with Westergren. He did not tell him of the pending civil litigation between United Sales and Bass, nor did he tell him that the machine was in a bonded warehouse, because "I had no idea it was in a bonded warehouse".

Metzger testified that he was in Plainview on August 11, 1971, when he received a telephone call from Wilson advising him that Bass had picked up the machine from Flato's. He said:

"[I] immediately referred him to Mr. Hall, to take the question at hand to Mr. Hall and not to do a thing without Mr. Hall's consent and assistance".

While on the stand, Metzger further testified about his answer to the question asked in a previous deposition as to what Wilson told him on August 11, 1971, stating:

"My answer at that time was 'that he told me Bass had taken this Savin machine and he thought he ought to be charged with theft'."

At the trial, Metzger was not positive that Wilson "did make reference to the charge".

Metzger further testified:

"Q You turned that matter over to him (Wilson), to his discretion, to decide after talking to Mr. Hall whether or not to file a complaint against Mr. Bass, did you not?

A No, I—my instructions were that he take the matter before Mr. Hall and act according to Mr. Hall's decisions.

Q Okay. Did you give Mr. Wilson any specific instructions as to what he was to tell Mr. Hall?

A No, nothing other than just exactly what the situation was that he found."

Hall, at the trial, did not have any independent recollection of the details of the conversation between him and Wilson on August 11, 1971. He did say:

"[I] would not have done any more than tell him to simply go and talk to the District Attorney and relate the facts, and the District Attorney, or his staff, would tell him whether the facts, as related, amounted to the commission of a crime, or not."

Westergren testified that Wilson told him that Bass "went to Flato Brothers and took a machine that he didn't have any business taking". He also stated that if he had known about the *"United Sales"* suit he would not have taken the complaint against Bass, but would have required more investigation before permitting the complaint to be filed.

There is no evidence that the appointment of Wilson as agent for Metzger was ever revoked. It is conclusively established that from December, 1970 until the time the complaint against Bass was signed, Metzger was an executive officer of United Sales, and was the only such officer of the corporation who acted in such capacity. Since the liability of Metzger and United

Sales, if any, flows from Wilson's acts, we first dispose of points 2–5 asserted by Bass and the cross points brought forward by Metzger and United Sales.

■ There is ample evidence to sustain the jury finding that Wilson acted without probable cause in filing the complaint against Bass, as found by the jury in response to the inquiry made in Special Issue No. 2. Wilson was present at the hearing in the *"United Sales"* suit on July 29, 1971. Wilson testified that it was his "understanding" that all property belonging to United Sales in the possession of Bass and Lee would, under Court order, be put in a bonded warehouse for safekeeping. The complaint was filed after Bass placed the copy machine in the warehouse. The jury was entitled to conclude from the disputed state of the evidence that Wilson was informed that Bass, in obedience to the then outstanding court order, was going to put the machine in a bonded warehouse. Wilson did not relate this fact to Assistant District Attorney Westergren. Wilson did not check with Didear Warehouse, nor did he inquire of Bass what he had done with the machine. Wilson made no attempt to verify Schmidt's statement concerning what Bass told him when he picked up the machine. The testimony, being conflicting as to whether Wilson had been informed by Schmidt that Bass was going to place the machine in a bonded warehouse, presented a question for the jury to determine. *Andrews v. Dewberry*, 242 S.W.2d 685 (Tex. Civ.App.—Fort Worth 1951, writ ref'd n. r. e.); *Moran Utilities Company v. J. W. Childs*, 392 S.W.2d 536 (Tex.Civ.App.—Beaumont 1965, writ ref'd n. r. e.). The jury was entitled to conclude that Wilson did not make a full and fair disclosure of all material facts to the district attorney and therefore acted without probable cause. *J. C. Penney Company v. Gilford*, 422 S.W.2d 25 (Tex.Civ.App.—Houston [1st Dist.] 1967, writ ref'd n. r. e.).

■ There is, if the jury chose to believe Schmidt, some evidence of ill will or evil motive on the part of Wilson in filing the complaint. However, malice may be in-

ferred from want of probable cause and from wrongful conduct in reckless disregard of the rights of another, even where there is no direct proof of the same. *Gulf, C. & S. F. Ry. Co. v. James*, 73 Tex. 12, 10 S.W. 744 (1889); *Tennessee Gas Transmission Company v. Moorhead*, 405 S.W.2d 81 (Tex.Civ.App.—Beaumont 1966, writ ref'd n. r. e.); *Aldana v. Tavazon*, 15 S.W.2d 678 (Tex.Civ.App.—El Paso 1929, no writ); *J. C. Penney Company v. Gilford*, supra; *Andrews v. Dewberry*, supra.

There is some evidence that Wilson, while being aware of the pending civil litigation concerning United Sales' properties, withheld such information from the District Attorney, even though it was clearly material to whether a complaint should issue. Such evidence supports a finding that Wilson acted with malice. In reviewing the entire record, we think the evidence is factually sufficient to support the jury's finding that Wilson acted without probable cause in signing the criminal complaint against Bass. The first cross point is overruled.

The second, third and fourth cross points read, as follows:

### Second Cross Point

"The court erred in rendering Judgment against Metzger and United Sales, Inc. for the reason there was no evidence to support the jury's finding in answer to Special Issue No. 3 that Metzger and United Sales, Inc. 'aided' or 'cooperated' in the filing of criminal charges against Bass, and such finding was not supported by factually sufficient evidence."

### Third Cross Point

"The court erred in rendering Judgment against United Sales, Inc. for the reason there was no evidence to support the jury finding in answer to Special Issue No. 4 that Wilson and United Sales, Inc. acted with malice, and such finding was not supported by factually sufficient evidence."

### Fourth Cross Point

"The court erred in rendering judgment against Metzger because there was no evidence to support the jury's findings in answer to Special Issue Nos. 6, 7, 8, 8a and 9 that Wilson was the employee, agent and manager of Metzger acting in the scope of his employment and such findings are not supported by factually sufficient evidence."

■ It is obvious that the cross points are multifarious. Each embraces more than one ground of error and requires us to review the evidence under different standards. Until late 1974, the Courts of Civil Appeals, in almost every instance when presented with such a point, held that such points, being multifarious, should be overruled. Recent cases, however, have given a more liberal interpretation to the briefing rules in favor of the sufficiency of a point, and the appellate courts now frequently consider a multifarious point where, from the statement and argument under the point, the precise nature of the complaint can be determined. See *Eoff v. Muskiet*, 561 S.W.2d 542 (Tex.Civ.App.—Beaumont 1977, writ ref'd n. r. e.); *Kroger Co. v. Cellan*, 560 S.W.2d 505 (Tex.Civ.App.—Tyler 1977, writ ref'd n. r. e.); *Brungs v. Consolidated Plan Service, Inc.*, 529 S.W.2d 79 (Tex.Civ.App.—San Antonio 1975, writ ref'd n. r. e.); *City of Houston v. Jean*, 517 S.W.2d 596 (Tex.Civ.App.—Houston [1st Dist.] 1974, writ ref'd n. r. e.). The Supreme Court, in *O'Neil v. Mack Trucks, Inc.*, 542 S.W.2d 112 (Tex.Sup.1976), in reaffirming the rule announced in *Fambrough v. Wagley*, 140 Tex. 577, 169 S.W.2d 478 (1943), very pointedly stated that a Court of Civil Appeals should look, not only to the point, but also to the statement and argument thereunder, "to determine the question of reversible error". In our examination of the statement and argument under each point, it is clear that the complaint is, directed, first, to the legal sufficiency of the evidence, with respect to the particular jury answer attacked. We, therefore, follow the rationale of the latest decisions by our appellate courts and consider the points, together with the statement and argument under each, in determining the question of reversible error, even though each point is clearly multifarious.

It is settled law in this State, that before a plaintiff may recover damages for malicious prosecution he must allege and prove: 1) the commencement of a criminal action against him; 2) the prosecution was caused by the defendant or through defendant's aid or cooperation; 3) the action terminated in plaintiff's favor; 4) plaintiff was innocent; 5) there was no probable cause for the filing of the criminal complaint; 6) the filing of the complaint was done with malice; and 7) the criminal proceedings resulted in damage to plaintiff. *Flowers v. Central Power & Light Co.*, 314 S.W.2d 373 (Tex.Civ.App.—Waco 1958, writ ref'd n. r. e.); *K–Mart No. 4195 v. Judge*, 515 S.W.2d 148 (Tex.Civ.App.—Beaumont 1974, writ dism'd); *Parker v. Dallas Hunting and Fishing Club*, 463 S.W.2d 496 (Tex.Civ.App.—Dallas 1971, no writ).

In order to hold the master liable in actual damages for a tort committed by his servant, the rule was stated in *Gulf, C. & S. F. Ry. Co. v. Cobb*, 45 S.W.2d 323, 325 (Tex.Civ.App.—Austin 1931, writ dism'd):

"In practically all jurisdictions, the law is now well settled that a master is liable for the willful and malicious acts of his servant when done within the scope of his employment . . . ."

The rule, so announced, was expressly approved in *Houston Transit Co. v. Felder*, 146 Tex. 428, 208 S.W.2d 880 (1948). The real test of the master's liability for a tort committed by his servant is not "whether the act complained of was done in accordance with the master's instructions, but whether the act complained of arose directly out of and was done in the prosecution of the business that the servant was employed to do". *National Life & Accident Ins. Co. v. Ringo*, 137 S.W.2d 828 (Tex.Civ.App.—Dallas 1940, writ ref'd); *Dupree v. Piggly Wiggly Shop Rite Foods, Inc.*, 542 S.W.2d 882, 886–887 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n. r. e.); 2 Tex.Jur., Agency, §§ 173, 199 (1959). If, under these general principles of law, it is shown that the act of the servant about which complaint is made was done within the scope of the servant's employment, the master is

liable for actual damages, even if the act was in disobedience of and contrary to the order of the master. 2 Tex.Jur.2d, Agency, § 179 (1959); 3 Am.Jur.2d, Agency, § 267 (1962); *Cobb*, supra.

In regard to punitive damages, it was held in the case of *Fisher v. Carrousel Motor Hotel, Inc.*, 424 S.W.2d 627, 630 (Tex. Sup.1967):

"The rule in Texas is that a principal or master is liable for exemplary or punitive damages because of the acts of his agent, but only if: a) the principal authorized the doing and the manner of the act, or b) the agent was unfit and the principal was reckless in employing him, or c) the agent was employed in a managerial capacity and was acting in the scope of employment, or d) the employer or manager of the employer ratified or approved the act."

In an action for malicious prosecution when neither the master nor the principal actually signed the criminal complaint, but where the same was signed by the servant or the agent, the questions: 1) whether the master or the principal "aided" or "cooperated" in the filing of the complaint, and 2) whether the servant or the agent acted within the scope of his employment when he instituted the criminal proceedings by signing the complaint, are questions of fact for the jury where the same are in dispute. *Davis v. Teague*, 256 S.W. 957 (Tex.Civ.App.—Beaumont 1923, writ dism'd); *Underwood Typewriter Co. v. Shouldis*, 253 S.W. 935 (Tex.Civ.App.—Galveston 1923, no writ). Whether an agent or an employee failed to disclose material facts within his knowledge to the district attorney when he signed a criminal complaint is also a question of fact for the jury in a malicious prosecution case. *Mercury v. Mustachia*, 540 S.W.2d 339 (Tex.Civ.App.—Corpus Christi 1976, no writ).

Having determined that there is sufficient evidence to sustain the jury findings that Wilson acted without probable cause and with malice in filing the complaint, we now turn to the issues relating to the liability of Metzger and United Sales for the acts

of Wilson. In disposing of the "no evidence" cross points, we will view the evidence in the light most favorable in support of the jury's findings, will consider only the evidence and inferences which support such findings, and will not consider any evidence or inferences contrary thereto. *Miller v. Riata Cadillac Company*, 517 S.W.2d 773 (Tex.Sup.1975). In disposing of the "factually insufficient evidence" cross points, we review and consider all the evidence. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

The jury expressly found that neither Metzger nor United Sales was "reckless" in employing Wilson, and further found that neither "ratified" the filing of the complaint. Those findings are not attacked by Bass in this appeal. Consequently, in order to sustain the jury findings of exemplary damages with respect to Metzger and United Sales, the record must show that Metzger, individually and as an officer of United Sales: 1) authorized the doing and the manner of the act; or, 2) Wilson was employed in a managerial capacity and was acting in the scope of his employment.

It is clearly shown by the evidence that Wilson, on the date that he filed the criminal complaint against Bass, was Metzger's agent and was also an employee of United Sales, and was employed in a managerial capacity. The scope of his duties and responsibilities, both as the agent of Metzger and as the general manager of United Sales, was extremely broad.

Wilson consulted with Metzger about the disappearance of the copy machine prior to the filing of the complaint, and while it is disputed whether or not Wilson informed Metzger that he thought that Bass ought to be charged with theft, Metzger, nevertheless, authorized Wilson to pursue the matter further. He considered the matter still within Wilson's authority to act, both as agent and employee. Specifically, Metzger told Wilson to talk to Hall and to act on his advice. Wilson, on the advice of Hall, contacted the district attorney. While, as a general rule, a corporate officer is protected against individual liability arising from the acts of his employer-corporation, in the instant case, we find that Metzger's involvement in the act in question was under exceptional circumstances. Metzger, at all times, was Wilson's principal in accordance with the provisions of the power of attorney and he had expressly authorized Wilson to "act for me in my place and stead in all transactions concerning United Sales"; at the same time, Metzger was the executive officer of United Sales. All of Metzger's acts were performed by him in his dual capacity: 1) individually as a principal; and 2) as an officer of United Sales. There is ample evidence that Metzger, both individually and as an officer of United Sales authorized Wilson to resolve the matter involving the disappearance of the copy machine. It makes no difference that Wilson may not have told Westergren all of the material facts and may have ignored Hall's orders in that respect since Metzger must have known the possible end-result of Wilson's activities and did nothing to restrict him in any way. Metzger ordered Wilson to contact Hall and to act on his advice. Wilson did that. Hall told him to go to the district attorney's office. Wilson did that.

We hold that Wilson was acting in the scope of his employment as Metzger's agent and also as United Sales' employee at the time of the incident made the basis of this suit. As noted, our Supreme Court, in *Fisher v. Carrousel Motor Hotel, Inc.*, supra, has set out four separate and disjunctive categories as a basis for holding a principal or master liable for exemplary damages because of the acts of his agent or servant. Since it was found by the jury that Wilson was the agent of Metzger, was employed by United Sales in a managerial capacity, and was acting within the scope of his employment by both Metzger and United Sales in the matter of the filing of the complaint, it is immaterial whether either Metzger or United Sales authorized or approved the act in question. See *Carrousel*, supra.

We find that there was ample evidence of probative value to support both the jury's findings which were set aside by the trial court and those which are attacked by

Metzger and United Sales. Accordingly, points 2, 3, 4 and 5 urged by Bass are sustained, and all of the cross points asserted by Metzger and United Sales are overruled.

In point 1, Bass complains that the trial court erred in failing to render a judgment for him "including exemplary damages in the sum of $31,000.00, jointly and severally", against Wilson, Metzger and United Sales. The point has no merit. The jury found that Bass was entitled to recover against each defendant a *certain* sum of money as exemplary damages. Bass has not shown us any reason why he should recover a joint and several judgment for exemplary damages against the said defendants for the sum total of the awards against each defendant. Point 1 is overruled.

In points 7 and 8, Bass contends that the trial court erred: 1) in dismissing Cole, individually, as a defendant following his special appearance in the case; and 2) in overruling his motion to reinstate Cole, individually, as a defendant in the case. The allegations in Bass' petition are sufficient to invoke the "commission of a tort" provision of Tex.Rev.Civ.Stat.Ann. art. 2031b (1964). Cole was a non-resident of the State of Texas, and all acts performed by him which Bass claims gave the trial court jurisdiction over him, including the signing of checks drawn on a Texas Bank, hereinafter noted, were performed by him in his capacity as a corporate officer of Copi-Rite, Inc., a non-resident corporation.

Wilson, prior to June 28, 1971, was employed by Copi-Rite, Inc. Cole was an executive officer of Copi-Rite. As far as Cole or Copi-Rite were concerned, when the agreement between Wilson and Metzger was reached, Wilson was no longer an employee of Copi-Rite. At the request of Wilson, for the avowed purpose of avoiding the payment of excessive social security taxes, and since it was not definitely settled as to just how long he would be in the employ of United Sales, Copi-Rite, during the times in question, paid Wilson the compensation which he and Metzger had agreed upon, but was reimbursed by United Sales for all such sums of money so paid. However, neither Cole nor Copi-Rite had a right to control Wilson's activities after he came to Corpus Christi, and in fact no such control was ever attempted. The only person who had such right of control was Metzger in his capacity as a corporate officer of United Sales. Apparently, the main reason why Cole and Copi-Rite agreed to permit Wilson to go to work for United Sales was because of the desire that Copi-Rite would become United Sales' major supplier of paper and related supplies. Even though it was Metzger's understanding that Wilson would be with United Sales for only a limited period of time, there is no evidence that from June 28, 1971 through August 24, 1971, when the complaint against Bass was dismissed, that Wilson was an employee of either Cole or Copi-Rite.

At the hearing with respect to the special appearance by Cole, the latter testified that he was not contacted by either Wilson or Metzger prior to the signing of the complaint and that he did not authorize the filing of such complaint. As already stated, the jury, at the trial on the merits, exonerated Copi-Rite of any liability, and judgment was rendered that Bass take nothing against Copi-Rite. Bass does not complain by a point of error of those findings and that portion of the judgment. The fact that Cole, a non-resident of Texas, signed checks, which were drawn on a Texas Bank account, to pay Wilson for the services performed by him in Texas for United Sales is not sufficient to establish jurisdiction over Cole in his individual capacity. The evidence adduced at the hearing on the matter of Cole's special appearance does not meet the jurisdictional tests of sufficient contact by Cole as set out in *U–Anchor Advertising, Inc. v. Burt*, 553 S.W.2d 760 (Tex.Sup.1977). Points 7 and 8 are overruled.

We have carefully considered the remaining points of error which have been brought forward by Bass. They are overruled.

That portion of the judgment which decreed that "James E. Bass, Jr. do have and recover of and from Defendants Joe D.

Wilson, J. Robert Metzger and United Sales, Inc., jointly and severally, the sum of $10,000.00 actual damages plus interest thereon at the rate of nine (9%) per cent per annum from date of this Judgment until paid", is affirmed that portion of the judgment which decreed that "James E. Bass, Jr., be and he is hereby, denied any recovery for exemplary damages from and against J. Robert Metzger and United Sales, Inc.," is reversed, and judgment is here rendered that the plaintiff, James E. Bass, Jr., recover from the defendant J. Robert Metzger the sum of $12,500.00 exemplary damages, and recover from the defendant United Sales, Inc., the sum of $10,000.00 exemplary damages, together with interest thereon at the rate of nine (9%) per cent per annum from February 1, 1977 (when the trial court's judgment was signed), until paid. Costs of this appeal are taxed, 25% to Bass and 75%, jointly and severally, to Metzger and United Sales.

AFFIRMED IN PART and REVERSED AND RENDERED IN PART.

YOUNG, HORACE S., Associate Justice, not participating.